1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9   MATTHEW McDANIEL,                    CASE NO. 1:11-cv-00880-SMS

10                        Plaintiff,

                                          ORDER REMANDING THE
11          v.                            AGENCY'S DENIAL OF BENEFITS
                                          FOR FURTHER PROCEEDINGS
12   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
13
                         Defendant.
14   _____/

15
16          Plaintiff Matthew McDaniel, by his attorneys, Frailing, Rockwell, Kelly & Duarte, seeks

17   judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

18   denying his application for disability insurance benefits under Title II of the Social Security Act

19   (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties'

20   cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder,

21   United States Magistrate Judge.  Following a review of the complete record and applicable law,

22   this Court remands this matter for further proceedings consistent with this opinion.

## I.     Administrative Record
23
### A.     Procedural History
24
            Plaintiff qualified for disability insurance benefits through December 31, 2011.  On
25
     January 25, 2008, Plaintiff applied for disability benefits pursuant to Title II of the Social
26
     Security Act, alleging disability beginning January 1, 2007.  His claims were initially denied on
27
     June 17, 2008, and upon reconsideration, on August 28, 2008.  On September 15, 2008, Plaintiff
28

filed a timely request for a hearing.  Plaintiff appeared and testified at a hearing on December 2, 2009.  On February 5, 2010, Administrative Law Judge Stephen W. Webster denied Plaintiff's application.  The Appeals Council denied review on March 30, 2011.  On May 27, 2011, Plaintiff filed a complaint seeking District Court review.

### B.    The Agency Record

**Plaintiff's testimony.**  Plaintiff (born July 26, 1963) lived alone.  He was able to perform his own personal care.  He drove himself when he felt well, although he reported suffering pain when the car bounced on bumpy roads.  He was able to warm prepared foods for himself using the microwave.  His adult daughter assisted with housekeeping, laundry, and yard care.

Plaintiff read books, magazines, and the newspaper from thirty to sixty minutes a day.  He did not have a television.  He used the computer very little.  He occasionally went out to the movies.  Plaintiff denied a criminal record.

Plaintiff completed high school and attended some college classes.  He attended special education classes because he couldn't "say the letters right."  AR 25.  He had not worked since January 2007.  His only support came from the Native American Food Clinics.

Plaintiff suffered back pain and depression.  His lower back was braced with metal plates and rods.  Disc problems in his neck caused his fingers to become numb.  He had begun to experience difficulty with his thumb and tail bone but had not consulted a doctor.  Plaintiff was received ongoing medical care at Central Valley Indian Health, which renewed his prescriptions, checked his blood pressure, and examined his back monthly.  Plaintiff did not receive psychological care since Central Valley Indian Health had no funds to provide it.

Plaintiff testified that he constantly experienced some degree of pain, which he described as shooting pain from his tailbone up his spine and gouging pain in his neck. He began to experience back pain within 30 to 45 minutes after he sat down.  Sometimes he was most comfortable standing and could stand and walk for quite some time.  Generally, he was comfortable standing for five to ten minutes.  The pain was best relieved by lying down.

Plaintiff used a cane even though no doctor prescribed it.  He explained that it helped him avoid turning his ankles when his feet were numb and eased getting back on his feet when he fell.

1    Plaintiff admitted that he previously "used to drink quite a bit." AR 23.  Now, he hardly

2    ever drank.

3    In response to his attorney's questions, Plaintiff testified that when he felt depressed he

4    cried.  His depression did not affect his ability to work because his back pain prevented him from

5    working.  Bending was most difficult.  Plaintiff testified, "I can't–I just can't do the work like I

6    used to do . . . .  No matter how hard I'd want to, I'm just going to hurt myself doing it, so then

7    you just, a person don't do it.  Because you know the next day you're going to, or that evening,

8    you're going to be in severe pain." AR 24.

9    **Daily Activities Questionnaire.**  Plaintiff reported that he always experienced some

10   pain, although morphine and Norco could mask it.  As a result, he spent the majority of his time

11   in bed.  Movement of his head could result in his losing his vision.  Walking could cause disc

12   movement that resulted in a loss of feeling in his legs and feet, and a resulting fall.  He avoided

13   lifting things and did not climb stairs.

14   Plaintiff did his own grocery shopping every two weeks, although lifting the bags caused

15   him pain.  He was able to drive an automatic car but suffered if he hit a bump.  Because

16   performing housework increased his pain, he had some one else do it for him.

17   **Other reports.**  In his adult disability report, Plaintiff stated that he stopped working on

18   December 31, 2006, when he could no longer stand the pain.  In another report, Plaintiff noted

19   that his pain prevented him from concentrating.  Numbness in his feet and ankles resulted in his

20   frequently turning his ankles.  He had become depressed.

21   In a telephone conversation with agency personnel, Plaintiff acknowledged that he had

22   previously consumed excessive alcohol in an attempt to self-medicate his pain.  Plaintiff reported

23   that he no longer drank alcohol.

24   **Medical records.**  The administrative record includes some medical records dating back

25   to 1991 as well as records concerning medical treatment for conditions not relevant to Plaintiff's

26   application for disability benefits.  This summary addresses only relevant treatment.

27   ///

28   ///

1    Plaintiff was treated for depression in 1999.  On September 23, 2001, Plaintiff was

2    treated in the emergency room of Madera Community Hospital for severe depression following

3    several days of heavy drinking.

4    From September 2001 through August 2005, Plaintiff received treatment at Concentra

5    Occupational Medical Center, usually seeing Theodore R. Johnstone, M.D.  Plaintiff experienced

6    situational depression in fall 2001 after his wife left him and the couple divorced.  In October

7    2001, Plaintiff's back was injured when, in the course of Plaintiff's arrest for driving under the

8    influence of alcohol, a police officer drove his knee into Plaintiff's back to force him onto a

9    gurney.  Thereafter, Plaintiff experienced back and lower extremity pain and numbness, and

10   "dribbling" following urination.  Although x-rays showed only mild degenerative changes, an

11   MRI showed a broad-based degenerative disc bulge/protrusion at L4-5 with mild marginal

12   spurring and mild central and proximal left neural foraminal stenosis.  It also revealed a right

13   posterior paracentral assymetric small bulge at L5-S1, but no significant compression of the

14   thecal sac or the nerve roots.  Dr. Johnstone referred Plaintiff to orthopedist Timothy C. Watson,

15   M.D.

16   After the 2001 injury, the medical records note repeated injuries to Plaintiff's back and

17   shoulders following his attempts to lift or pull various heavy objects. Dr. Johnstone noted

18   Plaintiff's worsening back pain as early as February 2002 and injuries to Plaintiff's left ankle as

19   early as March 2002.  On several occasions, the doctor noted that Plaintiff had no left Achilles

20   tendon reflex.

21   On January 31, 2002, surgeon William E. von Kaenel, M.D., performed diagnostic

22   myelography and epidurography.  Following the procedure, he diagnosed lumbar disc

23   displacement, lumbar radiculitis, and lumbar spine pain.  On February 13, 2002, Dr. von Kaenel

24   noted that Plaintiff was rapidly becoming habituated to Vicodin, raising concerns for post

25   operative medication.  On February 26, 2002, Dr. von Kaenel performed provocation

26   discography to assist Dr. Watson, who was considering surgical intervention.  In March 2002,

27   Dr. Watson performed surgery for lumbar decompression and L4-5 spinal fusion.

28   ///

A series of five lumbar spine x-rays performed August 7, 2007, confirmed that Plaintiff had spinal fusion at L4-5 which included two screws on each side of the vertebral body, spanned by a metal plate for stability. Radiologist Stephen Bruny, M.D., reported that disc space between L4-5 and L5-S1 had narrowed. In addition, the x-rays revealed extensive reactive change and an evident nitrogen effect.

**Dr. Johnstone's opinion.** On June 26, 2008, Dr. Johnstone completed a form entitled "Physical Residual Functional Capacity Questionnaire," apparently prepared by Plaintiff's attorney. Dr. Johnstone opined that the prognosis of improvement of Plaintiff's back pain was poor. Plaintiff's pain was affected by his depression and produced irritability that made Plaintiff incapable of tolerating even low stress jobs. Plaintiff was capable of sitting, standing, and walking less than two hours in an eight-hour workday; indeed, Plaintiff needed to change position after twenty minutes of sitting and five minutes of standing. Plaintiff needed to be able to shift position at will and would sometimes need to take unscheduled breaks. He could occasionally lift and carry less than ten pounds. Pain would frequently interrupt Plaintiff's attention and concentration in the course of a normal work day. Dr. Johnstone estimated that Plaintiff would miss about four days of work each month as a result of his impairments and treatment.

**Dr. Bugg's opinion.** On March 19, 2008, agency medical consultant George W. Bugg, M.D., completed a physical residual functional capacity assessment. Dr. Bugg opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; could sit, stand, and walk six hours in an eight-hour work day; had unlimited ability to push and pull; and could occasionally climb, kneel, crouch, and crawl.

**Dr. Michiel's opinion.** On May 17, 2008, psychiatrist Ekram Michiel conducted a psychiatric evaluation of Plaintiff. Plaintiff told Michiel that he drank heavily when he did not have prescription pain medication. He had last drunk beer three months before. Plaintiff also reported that he had been jailed two years earlier for driving under the influence and public intoxication. Michiel noted that Plaintiff appeared depressed.

///

1  Dr. Michiel diagnosed Plaintiff with depressive disorder NOS and alcohol abuse.  He

2 opined that Plaintiff was able to maintain attention and concentration, to carry out simple job

3 instructions, and to relate and interact with co-workers, supervisors, and the general public.

4 Plaintiff was unable to carry out an extensive variety of technical or complex instructions.

5 Michiel opined that Plaintiff's alcohol use rendered him unable to handle funds in his own

6 interest.

7  **Dr. Bilik's opinion.**  On June 5, 2008, psychologist Harvey Bilik, Psy.D., performed the

8 psychiatric review technique and determined Plaintiff's mental residual functional capacity.

9 Giving Dr. Michiel's report the greatest weight, Dr. Bilik opined that Plaintiff had an affective

10 disorder (depressive disorder NOS) that produced mild restriction of activities of daily living,

11 mild difficulties in maintaining social functioning, and moderate difficulties in maintaining

12 concentration, persistence, or pace.  Plaintiff had no episodes of decompensation.  Bilik opined

13 that Plaintiff had no significant psychiatric limitations except that he was moderately limited in

14 his ability to understand, remember, and carry out detailed instructions.

15  **Dr. Dhingra's opinion.**  On July 18, 2008, Meenakshi Dhingra, M.D., completed a form

16 entitled "Physical Residual Functional Capacity Questionnaire," which was the same form

17 preciously prepared by Dr. Johnstone.  Dr. Dhingra's responses were nearly identical to those of

18 Dr. Johnstone.

19  **Vocational expert.**  Judith Najarian testified as vocational expert.  She categorized

20 Plaintiff's prior work as a contractor since the duties that Plaintiff had performed matched the

21 DOT description, but she emphasized that Plaintiff had not performed all of the job duties of a

22 contractor and had not been licensed as a contractor when he developed his own land.  For

23 example, Plaintiff did not read blueprints.  As a result, Ms. Najarian considered Plaintiff to have

24 performed skilled work as a contractor-developer but adjusted the transferability of skills to

25 correspond only to skills that Plaintiff had actually performed.  Plaintiff also had transferable, but

26 industry-specific, skills from almond farming.

27  For the first hypothetical question, the ALJ directed Ms. Najarian to assume a person of

28 Plaintiff's age, education, and work history, who was able to lift twenty pounds occasionally and

6

ten pounds frequently; sit, stand, or walk six hours in an eight-hour work day; and occasionally stoop, crouch, kneel, and crawl.  Ms. Najarian opined that even though DOT classified "contractor" as light work, since Plaintiff performed his prior work as heavy, the hypothetical person could not perform Plaintiff's prior work.  Nor could a hypothetical person with the same background as Plaintiff work as a contractor for an employer other than himself.  The hypothetical person could work light, unskilled jobs, such as a cashier and toll collector (DOT 211.462-038), 120,918 jobs in California and nine times as many jobs in the United States; solderer (DOT 813.684-022), 4107 jobs in California and nine times as many jobs in the United States; and subassembler (DOT 729.684-054) 21,520 jobs in California and ten times as many jobs in the United States.  Total light, unskilled jobs in California were 799,177 in 2009, but Plaintiff could not perform all light, unskilled jobs because of his restrictions on stooping, crouching, and kneeling.

For the second hypothetical question, the ALJ directed Najarian to assume a hypothetical person of Plaintiff's age, education, and work history who could lift ten pounds occasionally; needed to sit or stand at will; and could occasionally stoop, crouch, kneel, or crawl.  Najarian opined that such a person could not perform Plaintiff's prior work.  The hypothetical individual could perform sedentary, unskilled jobs in which he could stand as necessary so long as he could maintain a working pace.  Examples of such sedentary, unskilled jobs included order clerk, food and beverage (DOT 209.567-014, SVP 2) with 2757 positions in California and nine times as many jobs in the United States; hand packer, such as ampule sealer (DOT 559.687-014) with 3105 jobs in California and nine times as many jobs in the United States; and loader, semi-conductor (DOT 726.687-030) with 2763 jobs in California and nine times as many jobs in the United States.

For the third hypothetical question, the ALJ asked Ms. Najarian if her responses to questions one and two would change if the individual were limited to simple, routine, repetitive work.  She responded, "No."

For the fourth hypothetical question, the ALJ asked Ms. Najarian if her answer would change if the individual described in the second hypothetical question were to have occasional

problems maintaining attention, concentration, and pace.  Najarian responded that the hypothetical individual could not perform Plaintiff's past work and could not perform the exemplary positions since each required the individual to maintain the pace of production.

Plaintiff's attorney first questioned Ms. Najarian regarding the proper DOT numbers for the exemplary positions.  He then asked her whether the numbers of positions provided for the sedentary positions included erosion for the required sit-stand option.  Najarian responded that, although there was seating for a sedentary position, because the worker had the option to stand for those positions, there was no erosion of numbers for the sit-stand option.

## II.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |

///

Step five:     Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date.  Plaintiff's severe impairments included back injury (post surgery), degenerative disc disease, obesity, and depression.  His impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Plaintiff could not perform his past relevant work.

The ALJ determined that Plaintiff had the residual functional capacity to lift ten pounds occasionally; to stand and sit at will; and to occasionally stoop, kneel, crouch, and crawl.  He was limited to simple repetitive work.  Based on the testimony of the vocational expert, the ALJ concluded that jobs that Plaintiff could perform existed in significant numbers in the national economy.

## III.    Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See*

1   *Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).   "Where

2   the evidence as a whole can support either outcome, we may not substitute our judgment for the

3   ALJ's."   *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

4   **IV.   <u>Discussion</u>**

5        Relying on an unpublished opinion, *Pangle v. Astrue*, 2010 WL 668912 (E.D.Cal.

6   February 23, 2010) (No. 1:08-cv-01760-DLB), Plaintiff's sole claim on appeal is that the ALJ

7   erred in relying on Ms. Najarian's testimony as vocational expert since the ALJ failed to ask Ms.

8   Najarian if her opinion was consistent with the DOT.  Plaintiff alleges that Ms. Najarian's

9   testimony was inconsistent with the DOT because the DOT does not address whether a specific

10  job or occupation permits a worker to sit or stand at will.

11       In both the hearing and the hearing decision in this case, Judge Webster consistently

12  addressed Plaintiff's need to sit or stand at will.  His second hypothetical question to Ms. Najarian

13  described an individual capable of performing sedentary work except that the individual needed to

14  be able to sit or stand at will, among other non-exertional limitations.  Najarian responded that

15  sedentary unskilled positions that included the option to sit or stand at will were available in

16  significant numbers, provided the individual could continue to maintain a working pace while

17  performing the job.  The ALJ never asked Ms. Najarian whether her testimony was consistent

18  with the DOT.

19       At the close of the hearing, Plaintiff's attorney asked Ms. Najarian if the numbers of

20  available sedentary jobs reflected erosion for Plaintiff's requirement that he be able to sit or stand

21  at will.  Ms. Najarian responded that there was no erosion because by definition, a sedentary job

22  provided seating.  If an individual could maintain the pace of the work of a sedentary job, she

23  explained, he or she need not only sit, but could stand up at will while working.  Neither

24  Plaintiff's attorney nor the ALJ asked Ms. Najarian for the basis of this opinion, and she did not

25  volunteer that information.

26       "The DOT 'is not the sole source of admissible information concerning jobs.'"  *Johnson v.*

27  *Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995), *quoting Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir.

28  ///

1994). The DOT itself indicates that it is not a comprehensive source, directing users to

supplement its data with local information concerning specific job requirements. *Id.*

Social Security Ruling 00-4p was promulgated to clarify standards for the use of testimony

provided by vocational experts.  The ruling requires that, before relying on the opinion of a

vocational expert, an adjudicator must "[i]dentify and obtain a reasonable explanation for any

conflicts between occupational evidence provided by VEs . . . . and information in the Dictionary

of Occupational Titles (DOT)."  SSR 00-4p at *1 (December 4, 2000).  It cautions:

> Neither the DOT nor the VE . . . . evidence automatically trumps when there is a
> conflict.  The adjudicator must resolve the conflict by determining whether the
> explanation given by the VE . . . . is reasonable and provides a basis for relying on
> the VE . . . . testimony rather than on the DOT information.

SSR 00-4p at *2.

When a vocational expert provides evidence about the requirements of a job, the ALJ is

required to ask (1) whether the information to which the vocational expert has testified is

consistent with the DOT, and (2) if the evidence appears to be inconsistent with the DOT, whether

there is a reasonable explanation for the apparent conflict.  SSR 00-4p at *4.  That the ALJ failed

to ask Ms. Najarian if her testimony was consistent with the DOT is uncontested.  Thus, the ALJ

failed to perform his "affirmative responsibility" to ensure that the record clearly supports his

reliance on Ms. Najarian's testimony.  *See Valenzuela v. Astrue*, 2009 WL 1537876 at *3 (N.D.

Cal. June 2, 2009) (No. C 08-04001 WHA).

Despite the Ruling's imposing on administrative law judges an affirmative obligation to

question a vocation expert about inconsistencies between his or her testimony and the DOT,

"failure of inquiry by itself does not make the ALJ's decision reversible."  *Id*.  Reversal based on

procedural error is only appropriate when the potential inconsistencies in the evidence require

resolution.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).  In the hearing decision, the

ALJ must explain how he or she resolved the apparent conflict.  SSR 00-4p at *4.  An ALJ may

not rely on the vocational expert's testimony if the evidence is based on underlying assumptions

or definitions that are inconsistent with regulatory policies or definitions.  SSR 00-4p at *3.

///

A procedural error regarding a perceived conflict between vocational expert testimony and the DOT is harmless if there is no conflict or if the vocational expert provided sufficient support for her conclusion to justify any potential conflict. *Massachi*, 486 F.3d at 1154 n. 19. *See also Greer v. Astrue*, 322 Fed.Appx. 513, 515-16 (9th Cir. 2009) (directing the District Court to remand the case to the ALJ where (1) the ALJ had failed to ask the vocational expert whether his testimony was consistent with the DOT, and (2) due to multiple inaudible passages in the hearing transcript, the Court was unable to determine whether the evidence provided substantial evidence to support the ALJ's determination to accept the vocational expert's testimony); *Mickelson-Wurm v. Commissioner Social Security Admin.*, 285 Fed.Appx. 482, 486 (9th Cir. 2008) (finding that the apparent conflict was adequately resolved by the vocational expert's testimony that she had determined that the position of a utilization review contractor nurse was appropriately classed as sedentary rather than light exertion based on her own experience and a telephone survey of hospitals and clinics regarding the duties performed and skills performed by persons holding the position of utilization review contractor nurse).  As applied in the Ninth Circuit, SSR 00-4p continues the standard articulated in *Johnson*, 60 F.3d at 1435: "[A]n ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation."

The Commissioner argues that these provisions do not apply here because the vocational expert testimony was not inconsistent with the DOT, which is silent on the question of the option to sit or stand.  Ms. Najarian's testimony regarding the option to sit or stand while performing sedentary jobs supplemented the DOT definition of sedentary work and its descriptions of the jobs she offered as examples of work that Plaintiff could perform.  The Ninth Circuit has previously treated such supplementary information as contradictory, requiring the ALJ to address and explain the basis for the ALJ's opinion. *Buckner-Larkin v. Astrue*, 450 Fed.Appx. 626, 628-29 (9th Cir. 2011).  In *Buckner-Larkin*, the vocational expert testified that, since the DOT did not discuss a sit-stand option, he based his opinion on labor market surveys. experience, and research. *Id.* at 628. *See also Pangle*, 2010 WL 668912 at * 11 (rejecting the Commissioner's argument that supplementary information does not "conflict" with the DOT, and concluding that the ALJ erred

Case 1:11-cv-00880-SMS   Document 17   Filed 10/22/12   Page 13 of 13

in failing to question the vocational expert regarding the conflict and the basis for the expert's opinion).

The ALJ failed to ask Ms. Najarian if a conflict existed between her testimony and the DOT, and on what basis she rendered her opinion.  The hearing decision merely asserted an unsupported conclusion that the vocational expert opinion was consistent with the DOT.  This was error.

**V.      Conclusion and Order**

Because the ALJ failed to inquire regarding (1) the existence of a conflict between the vocational expert's opinion and the DOT and (2) the basis for the vocational expert's opinion, the Court must remand this matter to the Commissioner for further proceedings to the basis of the vocational expert's testimony that Plaintiff could sit or stand at will when performing the exemplary positions.

The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Matthew McDaniel and against Defendant Michael J. Astrue, Commissioner of Social Security.


IT IS SO ORDERED.

**Dated:     October 21, 2012**                           **/s/ Sandra M. Snyder**
                                                UNITED STATES MAGISTRATE JUDGE